**Loma ALLEN, a/k/a Loma Bagby, a/k/a Earlene Bagby, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–76–56.**

Court of Criminal Appeals of Oklahoma.

Dec. 1, 1976.

Rehearing Denied Jan. 11, 1977.

William H. Lewis, Oklahoma City, for appellant.

·Larry Derryberry, Atty. Gen., Harold T. Garvin, Jr., Asst. Atty. Gen., for appellee.

OPINION

BRETT, Presiding Judge:

Appellant, Loma Allen, hereinafter referred to as the defendant, was charged, tried and convicted in the District Court, Oklahoma County, Case No. CRF–74–2935, for the offense of Murder in the Second Degree, in violation of 21 O.S.Supp.1973, § 701.2. The jury fixed her punishment at ten (10) years to life imprisonment, and from said judgment and sentence, the de-

fendant has perfected a timely appeal to this Court.

The State called as its first witness, Juanita Lesley, who was employed as a bar maid at the "As You Like It" cafe at 419 North Stiles in Oklahoma City, Oklahoma. On Saturday August 31, 1974, the witness went to work sometime around noon. At approximately 9:00 p.m. that same evening one Oscar Mitchell entered the cafe and ordered a beer. After 5 or 10 minutes Lula Brown entered the cafe and joined Oscar Mitchell at his table. Subsequently, Alfred Mann Grayson, the deceased, entered the cafe and approached the table where Oscar Mitchell and Lula Brown were sitting. According to the testimony of the witness, Grayson did not take a seat at the table but stood at the end of the table and talked with Oscar Mitchell and Lula Brown. Then, again, after a lapse of approximately 20 or 25 minutes Loma Allen entered the restaurant and went directly to the table where the deceased was standing. The defendant took a position behind the deceased and told him "to get through talking to Lula Brown so he could take her to get her things." At this point, the witness returned to the kitchen to prepare food for another customer. After she had been in the kitchen for two or three minutes she heard a shot coming from the front of the restaurant. She left the kitchen and returned to the customer area where she observed the defendant standing over the deceased. She further testified that the defendant, while standing over the deceased, stated that she ought to shoot him again.

The State called as its next witness, Fred B. Jordan, an Assistant Chief Medical Examiner for the State of Oklahoma. Dr. Jordan testified that the deceased died as a result of a gunshot wound which entered his upper left abdomen. He further testified that, at the time of his death, the alcoholic content of the deceased's blood was 0.17%.

Next, the State called Lula Mae Brown. This witness testified that on the morning of August 31, 1974, at about 10:00 or 11:00 a.m., the deceased picked her up in his automobile. Later, that same day, she and the deceased arrived at the "As You Like It" Cafe in the deceased's car. As they came to a stop the defendant approached the deceased and told him that she wanted her things. At this point, the witness left the automobile and went into the cafe, informing the deceased, that she would wait for him inside. Approximately 5 minutes had elapsed when the deceased entered the cafe and joined the witness who had previously sat down at a table with Oscar Mitchell. The deceased, standing at the end of the table, asked the witness if she cared to accompany him while he took the defendant to his place to get the defendant's things. The witness declined the invitation at which time the defendant entered and demanded that the deceasd leave with her. Then, according to the testimony of the witness, the defendant directed her attention to the witness and questioned her regarding the fact that she, the witness, had slept with the deceased the night before. The witness refused to answer, however, the deceased informed the defendant that the witness had in fact been with him the previous night. The witness continued to ignore the defendant and the deceased turned around and faced the defendant. The witness momentarily turned her head to address Oscar Mitchell when she immediately heard a shot. Quickly looking, the witness observed the deceased fall over a pool table to the floor. She further testified that at no time during this brief confrontation with the defendant, did the deceased abuse the defendant in any manner.

Thereafter, the State rested its case.

Homer Riley and Gwendolyn Campbell, witnesses for the defendant, testified that on August 30, 1974, the night before the shooting, the deceased and the defendant engaged in a brief altercation. Gwendolyn Campbell accompanied the defendant to a barbecue place owned by Homer Riley. A short time after the defendant arrived at Homer's restaurant the deceased entered

and demanded to talk with the defendant. However, the defendant refused and the deceased grabbed her by the throat and began to choke her. Homer Riley, who was in the back of the restaurant, heard the noise and returned to the front of the restaurant. Observing the situation, Riley ordered the deceased to leave. Without further dispute, the deceased complied with the directions of Riley.

The defendant also called Ernest Butler, who, like Homer Riley, was the owner and operator of a barbecue place. The witness testified that in July of 1974 the deceased approached the defendant, who was in the witness' restaurant, and requested the defendant to talk to him. The defendant refused this request and the deceased left. Later, because the defendant expressed some fear of the deceased, the witness drove the defendant to her home. When the witness arrived at the home of the defendant the deceased was waiting there in his automobile.

The defendant called as her next witness, Sylvester Field who lived in the duplex next door to the defendant. The witness testified that in June of 1974 he was sitting out on the front porch when he observed the arrival of the taxicab in front of the defendant's home. After a few moments, the defendant stepped out front and yelled to the cab driver that she had not called the cab. The witness then observed the deceased, whom he knew well, raise up from the backseat of the cab and discharge a rifle in the direction of the defendant. As soon as the shots were fired the cab sped off, at which time, the witness rushed to the defendant in order to determine whether or not she had been struck by one of the shots. Once the witness discovered that the defendant was not harmed, he returned to his home and disregarded the incident.

The defendant also called Marie Gordon, who lived directly across the street from the "As You Like It" cafe, where the fatal shooting took place. The defendant testified that on the night in question she was out in her front yard babysitting for her daughter. She observed the defendant enter the cafe unaccompanied. However, not far behind her was the deceased, who was, according to her testimony, drinking a can of beer. Based on her other observations, the witness testified that the deceased's car was not in front of the cafe and that Lula Brown was no where to be seen.

The defendant took the stand and testified that she had met the deceased in 1967 or 1968. She further testified that she had dated the deceased off and on from that point and that she dated him steadily for approximately three years. However, in April of 1974 she terminated the relationship between herself and the deceased for the reason that the deceased was a violent man. At this point in her testimony the defendant testified in regard to the specific altercations herein before related.

The defendant testified that on the evening of August 31, 1974, she was on her way to the "As You Like It" cafe when she saw a man by the name of Jessie. She was walking down the sidewalk toward the cafe accompanied by this man, when the deceased stepped out from an alley and began to yell to the defendant to stop. The defendant ignored the deceased and entered the cafe. The deceased entered right behind the defendant and accused her of having sexual relations with other men. Still ignoring the deceased, the defendant leaned up against the pool table. The deceased went to the table where Oscar and Lula Brown were sitting. Finally, the deceased turned to the defendant and said "come on with me, I'll show you who you belong to" and the defendant told him that she belonged to her husband. At this time, the deceased reached for the defendant and she stepped back and shot him. According to her testimony she did not intend to kill the deceased but had attempted to shoot him in the leg.

The defendant further testified that, prior to the night of the shooting, she had never met or seen Lula Brown. She also testified that there was no discussion con-

cerning "her things" that she wanted the deceased to return to her.

Thereafter, the defendant rested.

 The defendant, in her first assignment of error, contends that the trial court committed reversible error by failing to admonish the jury in accordance with 22 O.S. 1971, § 854. This particular provision requires the trial court to admonish the jury "that it is their duty not to converse among themselves or with anyone else on any subject connected with the trial." Apparently, the trial was some what lengthy and at the end of the presentation of the evidence the trial judge decided that it would be in the better interest of both parties if the jury, after the reading of the instructions, was permitted to go home until the following morning when they were to return to hear the closing arguments and enter their deliberation. However, after the reading of the instructions the trial court adjourned without admonishing the jury as required by law. In response to the assignment of error predicated on this failure of the trial court to admonish the jury, the State counters with the argument that the defendant waived this error by failing to proffer an objection. We must agree. In *Yarbrough v. State*, 13 Okl.Cr. 140, 162 P. 678 (1917) this Court held that the trial court's failure to give the statutory admonition would not serve as a basis for reversal on appeal where the defendant had failed to object at trial. See, also, *Langley v. State*, 53 Okl.Cr. 401, 12 P.2d 254 (1932); *Rutherford v. State*, 95 Okl.Cr. 311, 245 P.2d 96 (1952); and, *Bryant v. State*, Okl.Cr., 521 P.2d 402 (1974).

Also, in *Bryant v. State*, supra, we indicated that the defendant must show "that the lack of admonition resulted in . . . prejudicial injury." We are, therefore, of the opinion that the failure of the defendant to object, coupled with the defendant's failure to demonstrate the likelihood of any resulting prejudice, renders this assignment of error without merit.

 The defendant, in his second assignment of error, contends that the evidence was insufficient to sustain a conviction for Murder in the Second Degree. In *Rutherford v. State*, supra, we held:

"This court has uniformly held that where evidence is conflicting or different inferences may be drawn therefrom, it is the jury's province to weigh evidence and determine facts, and their determination will not be disturbed unless it appears that such determination was not sustained by competent evidence or was influenced by passion or prejudice." (Citations Omitted)

Therefore, this assignment of error will not afford the defendant a basis for reversal.

On the basis of the foregoing discussion the defendant's conviction should be and is, hereby, *AFFIRMED*.

BUSSEY and BLISS, JJ., concur.